IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| ELIZABETH P.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:19-cv-00089 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:  Joel C. Hoppe |
| Acting Commissioner of Social Security | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Elizabeth P. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings and oral

arguments, and the applicable law, I cannot find that the Commissioner's final decision is

supported by substantial evidence. Accordingly, I respectfully recommend that the decision be

reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for former Commissioner Andrew M. Saul as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Elizabeth applied for DIB and SSI on April 30, 2013, alleging disability caused by back problems, severe allergies, foot problems, panic attacks, depression, bladder problems, EpiPen dependence, and anxiety. Administrative Record ("R.") 64, 73, 181–84, 187–91. She alleged that she became disabled on November 1, 2012. *Id.* She was fifty-seven years old, or a person of "advanced age" under the regulations, on her alleged onset date. R. 64, 73; 20 C.F.R. §§ 404.1563(e), 416.963(e). Disability Determination Services ("DDS"), the state agency, denied her claims initially in January 2014, R. 62–63, and upon reconsideration that October, R. 82–83. On March 25, 2016, ALJ R. Neely Owen issued an unfavorable decision after a hearing at which Elizabeth appeared with counsel and testified. R. 18–27. ALJ Owen denied Elizabeth's claims at step two by concluding that Elizabeth's numerous medical impairments were not "severe" during the relevant time, and, as such, she was "not disabled" under the Act. *See* R. 20–21, 26–27. The Appeals Council declined her request to review that decision in May 2017. R. 1–5.

Elizabeth then filed an appeal to this Court, contending that ALJ Owen's decision was not supported by substantial evidence. I agreed and issued a Report & Recommendation

("R&R") recommending that the presiding District Judge reverse the Commissioner's final decision and remand Elizabeth's case to the Commissioner under the fourth sentence of 42 U.S.C. § 405(g). *See* R. 1526–51 (R&R, *Elizabeth P. v. Berryhill*, No. 5:17cv66 (W.D. Va. Aug. 10, 2018), ECF No. 18). The Honorable Elizabeth K. Dillon adopted my R&R and remanded the case to the Commissioner in late September 2018. *See* R. 1524–25 (Order & Final J., *Elizabeth P. v. Berryhill*, No. 5:17cv66 (W.D. Va. Sept. 27, 2018), ECF No. 19). While that appeal was pending, Elizabeth filed a new application for DIB. *See* R. 1554 ("The claimant filed a subsequent claim for [DIB] . . . on July 20, 2017."). In early September 2018, DDS considered that DIB application and found Elizabeth to be disabled as of March 23, 2016. *Id.*; *see* Pl.'s Br. 10 (noting DDS granted the subsequent claim on September 7, 2018), ECF No. 20-1; Def.'s Br. 3 n.3 (same), ECF No. 27. Thus, when the Appeals Council vacated ALJ Owen's decision, it remanded the case to an ALJ with instructions to offer Elizabeth an opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision as to whether Elizabeth also was disabled before March 23, 2016. *Id.* In August 2019, Elizabeth appeared with counsel and testified at an administrative hearing before ALJ Theodore Kennedy. *See* R. 1476–91. A vocational expert ("VE") also testified at the hearing. R. 1491–95.

ALJ Kennedy issued an unfavorable decision on September 20, 2019. R. 1421–35. First, he found that Elizabeth had not engaged in substantial gainful activity since November 1, 2012, the alleged onset date. R. 1426. At step two, ALJ Kennedy found that Elizabeth had two severe impairments: obesity and degenerative disc disease of the spine. *Id.* Her documented history of depressive disorder, anxiety, gastroesophageal reflux disease, and irritable bowel syndrome were "nonsevere" medical conditions because, "[d]espite seeking and receiving treatment for these impairments, [Elizabeth] failed to allege any limitations, physical or otherwise, stemming from

them during the disability hearing" in August 2019. R. 1427. At step three, he concluded that none of Elizabeth's severe impairments, considered both alone and in combination, met or equaled any relevant Listing. R. 1429 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04). ALJ Kennedy then evaluated Elizabeth's residual functional capacity ("RFC") and determined that she could perform "medium"[4] work with additional limitations. R. 1430–34. She could lift and carry twenty-five pounds frequently and fifty pounds occasionally; she could "sit, stand, and walk for about six hours in an eight-hour day" and "constantly push or pull at the medium exertion level"; she could frequently climb stairs or ramps, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds; and she could never be exposed to unprotected heights. R. 1430.

Based on this RFC finding and the VE's testimony, ALJ Kennedy concluded that Elizabeth could return to her past relevant work as a daycare worker as that "light" exertion occupation was "actually and generally performed."[5] R. 1434 (citing R. 1492). ALJ Kennedy therefore found Elizabeth "not disabled" for the period from November 1, 2012, to March 22, 2016, and denied her applications for benefits.[6] R. 1434–35. Elizabeth appealed the Commissioner's final decision by filing the instant action in this Court.[7]

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). "The considerable lifting required for the full range of medium work usually requires frequent bending-stooping" and standing or walking, off and on, for about six hours total during an eight-hour day. SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "The full range of light work" requires a person to "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

[6] ALJ Kennedy's decision concludes by stating that Elizabeth had "not been under a disability" from "November 1, 2012, through the date of this decision," which was issued on September 20, 2019. *See* R. 1434. This appears to be a scrivener's error. The Commissioner had already determined that Elizabeth

5

III. Discussion

Elizabeth raises several arguments challenging ALJ Kennedy's decision. *See generally*

Pl.'s Br. 8–25. She argues that ALJ Kennedy erred by failing to (1) properly determine her

disability onset date, *id.* at 8–12; (2) address the effect of mild mental functional limitations on

the ability to perform semi-skilled or skilled work, *id.* at 12–17; (3) reconcile conflicting

vocational testimony at step four, *id.* at 17–19; (4) consider Elizabeth's allergies in assessing the

RFC; *id.* at 19–20, (5) support the RFC finding with substantial evidence, *id.* at 20–22; and (6)

support his rejection of Elizabeth's subjective allegations with substantial evidence, *id.* at 23–24.

Further, she asks this Court to remand her case to the Commissioner for an award of benefits as

of November 1, 2012. *Id.* at 24–25. Elizabeth's fifth argument is persuasive.

A.    *Summary*

1.    *Elizabeth's Symptoms & Testimony*

On September 11, 2013, Elizabeth submitted one Pain Questionnaire, R. 233–34, and one

Function Report, R. 237–45, as part of her applications for benefits. Elizabeth reported that she

lived in a house with her son, R. 237, and had experienced back pain for five years, which she

---

was disabled as of March 23, 2016, and ALJ Kennedy was tasked with determining only whether
Elizabeth was also disabled at any period from November 1, 2012 through March 22, 2016. *See* R. 1554.
Accordingly, his statement that Elizabeth was not disabled from her alleged onset date "through the date
of [his] decision" in 2019, R. 1434, is inaccurate.

[7] Claimants seeking DIB and SSI are generally required to exhaust administrative remedies, including by
requesting Appeals Council review of the ALJ's decision, before seeking federal court review under 42
U.S.C. § 405(g). *See* 20 C.F.R. §§ 404.900(a)(1)–(5), 416.1400(a)(1)–(5); *Smith v. Berryhill*, 139 S. Ct.
1765, 1772 (2019) ("Modern day claimants must generally proceed through a four-step process before
they can obtain review from a federal court."). Where, however, a claimant's case was previously
remanded to the Social Security Administration by a federal court, the claimant need not request Appeals
Council review before seeking federal court review of the ALJ's post-remand decision. In that instance, a
claimant may either (1) file exceptions with the Appeals Council or (2) seek federal court review after the
ALJ's decision becomes the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.984(b)–(d),
416.1484(b)–(d). Thus, because her case was previously remanded to the Social Security Administration
by Judge Dillon, Elizabeth was not required to seek Appeals Council review of ALJ Kennedy's decision.
Instead, she could seek review by this Court after ALJ Kennedy's decision became final. *See* R. 1422

described as aching, throbbing, and constant, R. 233–34. She indicated having difficulty with

lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. R.

242. She could lift five pounds, walk up to one hundred feet before stopping to rest, and pay

attention for a "long time." *Id.* She followed instructions well and could finish what she started,

but she did not handle stress or changes in routine well. R. 242–43. Lifting, going up and down

stairs, and reaching hurt her back. R. 233–34. She did not have any problems getting along with

others, including authority figures. R. 242–43. As to her daily activities, on a typical day, she

took her medication, ate (although she skipped lunch), showered, napped, read, and went to bed

by 7:00 p.m. R. 237, 241. Her sleeping was affected because she struggled to get comfortable in

bed; she also had a hard time getting out of bed, but she had no problem with personal care. R.

238. She prepared sandwiches daily, which took about ten minutes, but her son helped fix dinner.

R. 237, 239. Elizabeth found that her back problems made it harder to cook than before her

impairments manifested. R. 239. She did some chores, including laundry and cleaning, "a little

bit every day," but she had to take breaks and did not do any yardwork. R. 239–40. She shopped

for food, medicine, and coffee twice a week for about two hours. R. 240. Her hobbies included

reading the Bible, watching television, and going to church, which she did once a week although

she had to leave early because her feet and back hurt. R. 241–42. She socialized with her

children, whom she spoke with or saw every day. R. 241.

At the administrative hearing in January 2016, Elizabeth testified that she could not

return to work because of her low back pain, depression, and anxiety. R. 42, 47–49. She had

experienced low back pain for about the past ten years, but it had gotten worse in the last four or

five years. R. 43–44. The pain radiated from her lower back into her right leg, which sometimes

got weak, and she had a disabled parking placard. R. 46. No doctor had recommended surgery,

7

but she had received multiple injections, including "[a]pproximately six" in 2015, for the pain. R. 44. The degree of relief from the injections varied, but Elizabeth estimated that they worked for less than half of the year in 2015 and only then provided "[m]aybe 30%" relief. R. 44–45. Elizabeth also experienced anxiety and depression "probably half of [her] life." R. 47. She had four- to five-minute panic attacks four to five times a day up to five times per week during which she felt like her adrenaline raced, her vision blurred, and she just needed to get away. R. 47–49. The panic attacks were incapacitating, and she sat still and prayed until they passed. R. 48–49. As to her functional limitations, Elizabeth could stand for ten minutes before needing to sit down, could sit for twenty minutes before needing to get up and move around, and needed to lie down and stretch out every hour for about thirty minutes. R. 50. Bending at the waist pulled her back muscles, causing her to fall, and reaching also pulled her back muscles, so she needed her son to get things from the cabinet for her. R. 50–51. She still lived with her son, who did most of the cooking and cleaning, although she would sometimes vacuum for about ten minutes. R. 53. She spent most of her day reading, praying, and sometimes doing crossword puzzles. R. 54. A couple of times a month, her pain would get so bad that it would interfere with her concentration for about twenty minutes and affect her ability to read. *Id.*

At her administrative hearing in August 2019, Elizabeth alleged similar limitations, testifying that she suffered from depression and anxiety; back pain; hip, leg, and ankle impairments; and gastrointestinal issues. R. 1478, 1482–85. She did not believe she would be able to return to working at a daycare facility. R. 1480. She explained that the children she cared for while working weighed up to twenty pounds and explained that she could not lift that much because her back was "out." R. 1480–81. Her legs sometimes "buckled," which had caused her

to fall "at least" ten times, R. 1482–83, and she had limited abilities to stand, walk, and sit, lift

more than ten pounds, and reach up or down, R. 1486–88.

2.    *Relevant Medical Evidence*[8]

a.    *Low Back Pain*

Elizabeth complained of back pain as early as May 19, 2008, when she reported that

lifting a heavy television caused lower back pain, R. 535, and she continued to report back pain

intermittently over the next few years, R. 538, 573 (Nov. 2008); R. 576 (Dec. 2008); R. 584

(Sept. 2009); R. 606 (Jan. 2010); R. 442, 545 (June 2010). After the alleged onset date, on

February 20, 2013, an X-ray of her abdomen showed "some mild degenerative change of the

[sacroiliac ("SI")] joints and hips." R. 356. On March 9, Elizabeth presented to Kathleen Iudica,

M.D., complaining of moderate, but sharp and nauseating, lower back pain that began a few days

prior. R. 363. Dr. Iudica's physical examination notes document bilateral tenderness in the lower

lumbar area, but otherwise normal range of motion, strength, tone, reflexes, and sensation. R.

365–66. Dr. Iudica instructed Elizabeth to "[a]void aggravating tasks/no lifting greater than 10

pounds until symptom free," follow the provided home-based exercise program, and apply heat

to tender areas for fifteen to twenty minutes three times a day. R. 366. Dr. Iudica also prescribed

a thirty-day supply of tramadol. *Id.*

DDS initially denied Elizabeth's underlying applications for DIB and SSI in January

2014. R. 64–81. The agency physicians who reviewed her medical records determined that she

did not have a severe impairment either alone or in combination. DDS noted that although she

---

[8] A significant portion of the medical evidence in this case falls outside of the period relevant to the ALJ's determination of whether Elizabeth was disabled from November 1, 2012 through March 22, 2016. Accordingly, I do not summarize those medical records here.

reported back and hip pain, she had "never required imaging specific to these regions" and the only relevant findings came from the X-ray of the abdomen. R. 68, 77.

On April 18, Elizabeth treated with Christopher Hess, M.D., for her radiating back pain, which she described as moderate to severe and worsening. R. 801; *see* R. 800–05. Dr. Hess's notes indicate that Elizabeth attributed her pain's etiology to a 1996 motor vehicle accident, but that the "onset" of current pain was "2 years ago," particularly with lifting heavy objects. R. 801. On physical examination, Dr. Hess observed negative facet loading and Faber's test bilaterally; normal gait, paraspinous muscle tone, and bilateral lower extremity strength; paraspinous tenderness; and mild range of motion restriction of the lumbar spine with flexion, extension, and bending. R. 804. Dr. Hess ordered an X-ray, which revealed an "[u]nremarkable exam of the lumbar spine," R. 806, although Dr. Hess commented that it was "notable for mild end plate changes at L3/4," R. 800. Dr. Hess assessed lumbar degenerative disc disease and myofascial pain, started Elizabeth on baclofen, and provided a prescription for physical therapy. R. 800, 805.

During her initial visit to physical therapy on May 5, Elizabeth told the therapist that she had been lifting children into chairs about a year prior when she "felt a snap in her lower back." R. 811. The pain became worse in January 2014 when she "just woke up [with] pain in her back." *Id.* On physical examination, Elizabeth displayed lumbosacral tenderness; 50% range of motion with extension, flexion, rotation left, and rotation right; 25% range of motion with side bending left and side bending right; positive Faber's test bilaterally; and positive straight leg raising test at seventy degrees on the left and seventy-five degrees on the right. R. 812–13. Elizabeth presented for five more physical therapy appointments in May during which these objective observations did not change. R. 918–44.

Elizabeth followed up with Dr. Hess on August 13 reporting mild, radiating lower back pain, and she noted that medications and physical therapy helped "50%," although pain still restricted her activities. R. 887, 891. Other than paraspinous tenderness, Dr. Hess recorded an unremarkable physical examination with normal gait, strength, and lumbar spine range of motion; painless SI joints, buttock, and greater trochanter bilaterally; normal paraspinal muscle tone; and negative facet loading and Faber's test bilaterally. R. 895. He assessed myofascial pain, continued Elizabeth on baclofen and the home exercise program, and ordered an MRI of the lumbar spine. R. 896. The MRI, taken on August 21, revealed "[m]ild acquired central canal narrowing of L4-L5 due to broad-based disc bulge and posterior element hypertrophy" as well as "desiccation changes at L2-L3 and L3-L4." R. 885. Specific findings at L1-L2 and L2-L3 were "unremarkable"; L3-L4 had "[m]ild broad-based disc bulge with desiccation" and "[t]he foramina and central canal [were] patent"; L4-L5 had "[m]oderate disc desiccation and broad-based protrusion," patent foramina, and "mild ligamentum flavum thickening and facet hypertrophy," resulting in "[m]ild central stenosis"; and L5-S1 had "[m]ild facet hypertrophy" with patent "[c]entral canal and foramina." *Id.* Elizabeth followed up with Dr. Hess for an MRI review on September 17 and complained of moderate low back pain. R. 875–84. Dr. Hess's physical examination findings remained unchanged from the August 14 visit, except this time Elizabeth had positive facet loading bilaterally and no paraspinous tenderness. R. 883. After reviewing the MRI, Dr. Hess diagnosed lumbar facet arthropathy and lumbar degenerative disc disease, continued her on baclofen, and recommended a right medial branch block ("MBB") at L4-L5, R. 884, which Elizabeth received on October 14, R. 983–85.

On September 26, DDS conducted the reconsideration review of Elizabeth's applications. R. 84–114. The new evidence considered included the April 2014 X-ray, but not the August 2014 MRI. *See id.* DDS again found no severe medical impairments. *See id.*

During a visit with Justin Nolen, P.A., on October 21, 2014, Elizabeth stated that the MBB provided no relief and her pain remained constant. R. 990–91. On physical examination, PA Nolen observed non-antalgic gait, negative Romberg sign, paraspinous tenderness, and pain with motion. R. 993. He ordered bilateral L4-L5 and L5-S1 facet injections, R. 994, which Elizabeth received on November 11, R. 1084. Elizabeth followed up with PA Nolen on December 18, reporting severe, worsening low back pain and only one day of 50% relief from her first round of injections. R. 1070, 1078. Physical examination showed non-antalgic and full weight-bearing gait; normal posture, muscle tone, and deep tendon reflexes; and paraspinous tenderness. R. 1077. PA Nolen noted that Elizabeth did have "multilevel degenerative disk disease and facet joint changes" along with "mild stenosis [of the] lower lumbar spine," and he ordered another round of lumbar spine injections, R. 1078, which she received at L4-L5 on January 29, 2015. R. 1134. During follow up on February 5, Elizabeth reported "100% improvement in her low back and leg pain symptoms with recent epidural injection" and stated she was "very pleased with the results of injection." R. 1137. Elizabeth did "not wish to pursue additional treatment for her low back at [that] time," but she agreed to "follow up for future care as needed." *Id.*

Elizabeth received at least two more injections in 2015 on June 4 and November 24. R. 1143, 1152, 1155. Additionally, on July 17, 2015, during a visit to her primary care provider, Everett Ford, M.D., the review of systems was positive for back pain, and Elizabeth reported her

12

current pain as 8/10. *See* R. 1347–52. From 2016 through 2019, Elizabeth continued to complain

of lower back pain and her doctors performed multiple procedures to address these complaints.[9]

>    b.    *Anxiety & Depression*

Elizabeth also complained of depression as early as May 2008, R. 535, and anxiety as

early as November 2010 when she reported recent daily panic attacks, R. 521. Elizabeth began

regular mental health treatment at Comprehensive Behavioral Health on June 22, 2011. R. 348.

During her first visit, she reported depressed mood; intermittent anxiety, occasional panic

attacks, and worsening anxiety; no irritability; increased and spontaneous crying; normal sleep

pattern; fair energy; no change in concentration, memory, motivation, or interest; no anhedonia;

being socially active; no suicidal ideation; and a history of major depressive disorder and anxiety

dating back twenty years. *Id.* She had seen a counselor about ten years prior and found it helpful,

and since then had taken psychotropic medications prescribed by her primary care providers. *Id.*

She was currently taking Buspar and Ativan. *Id.* She noted that her thirty-five-year-old son lived

---

[9] In February 2016, Dr. Hess diagnosed lumbar radiculopathy and administered an epidural steroid injection ("ESI") at Elizabeth's right L4 vertebra. R. 2950–53. By Spring, Elizabeth still had significant back pain, R. 2237–40, and an MRI revealed "continue[d] degenerative disc disease from L2-3 through L4-5" with "prominent facet arthropathy bilaterally at the L4-5 level," R. 2284; *see also* R. 2273. In October, PA Nolen noted complaints of moderate-to-severe lumbar spinal pain, observed lumbar tenderness and painful range of motion, and diagnosed lumbar spondylosis without myelopathy or radiculopathy. R. 2539–41. A week later, Elizabeth had a bilateral lumbar/sacral medial branch block at L3-4-5, R. 3170–71, which provided limited relief, R. 2580. In November, she had a bilateral lumbar/sacral medial branch denervation at L3-4-5. R. 3216–17. Elizabeth continued to report lower back pain in early 2017. *See* R. 2828–31 (reporting "constant" symptoms (Mar. 2017)), R. 3292–95 (noting that her pain was "refractory to conservative measures" (May 2017)). In May, she had another bilateral lumbar/sacral medial branch denervation at L3-4-5, R. 3299–300, which reduced her lower back symptoms by fifty percent, R. 3597. By September, Elizabeth's symptoms had returned, R. 3695–99, and in October, she had a bilateral lumbar intra-articular facet joint injection at L3-4 and L4-5, R. 4143–44. In January, Elizabeth had another bilateral lumbar/sacral medial branch denervation at L3-4 and L4-5, R. 4228–29, and in February, she reported "improved" symptoms that were worse when walking up and down stairs and better with rest, R. 3875. In July 2018, Elizabeth had a fourth bilateral lumbar/sacral medial branch denervation, administered at L2-3 and L3-4. R. 4347–48. In August, Elizabeth reported that the procedure provided ninety-nine percent relief. R. 5068. Her pain had returned by February 2019, R. 5409–12, and she had a fifth bilateral lumbar/sacral medial branch denervation, administered at L2-3 and L3-4, in March 2019, R. 4505–06; *see also* R. 5620 (noting "80% relief" from the March procedure (April 2019)).

with her and although they were currently staying with friends, they were looking for an apartment. *Id.* She also reported working full time at a daycare, having close friends, and being active in her church.[10] *Id.* On mental status evaluation, she had a "probably depressed" mood (as stated by patient), restricted affect, clear cognition, logical thought process, intact insight and judgment, and no perceptual abnormalities. *Id.* She was diagnosed with major depressive affective disorder, recurrent episode, severe, without mention of psychotic behavior; started on Zoloft; and continued on Buspar and Ativan. R. 349.

Elizabeth returned to Comprehensive Behavioral Health ten more times over the next two years. *See* R. 327–47. During the seven visits prior to the alleged onset date, Elizabeth reported gradual improvement of symptoms. R. 334–47. Anxiety state, unspecified, was added as an additional diagnosis on October 5, 2011, R. 347, but the other diagnoses remained the same. R. 334–47. By August 20, 2012, Elizabeth reported doing well overall and feeling stable in her mood. R. 334. After the alleged onset date, on November 19, 2012, she again stated that she was doing well. R. 332–33.

On February 19, 2013, however, her situation and mood had worsened since getting fired from her job at a daycare center in late November 2012. R. 330; *see* R. 224. She was very tearful about the loss of this job, which she had held for eleven years. R. 330. Her anxiety level had increased since November 2012, and Elizabeth relayed that Ativan and Zoloft were not as helpful as they had been. *Id.* She was living with her son in a house "given" to her by her daughter and son-in-law. *Id.* Her son "like[d] her being at home to take care of the house, cook meals, etc., but [she] would prefer to be working," and she had applied "for numerous jobs," but

---

[10] This "history questionnaire" section of the progress notes remained the same throughout the two years that Elizabeth treated at Comprehensive Behavioral Health, as it did not adjust for her son's age or her changed work status. *See* R. 327–49.

could not acquire one. *Id.* She reported a depressed and anxious mood; worsening anxiety; "a little" irritability; increased crying; disrupted sleep pattern; fair energy; no change in concentration; no change or problems in memory; decreased motivation; no anhedonia; no suicidal ideation; and self-isolating behavior. *Id.* On mental status examination, she was cooperative and had normal behavior; a depressed and anxious mood (as stated by patient); dysphoric affect; clear cognition; logical thought process; intact insight and judgment; and no perceptual abnormalities. R. 330–31. Her prescription for Zoloft was increased, and Klonopin was substituted for Ativan. R. 330.

During a follow-up visit on July 16, Elizabeth reported that she was "not good." R. 327. She initially found the increased Zoloft helpful, but that was no longer the case. *Id.* Her complaints of symptoms did not change much from February, except she now reported poor energy as well. *Id.* On mental status examination, she had normal speech, logical and linear thought processes, intact associations, no suicidal or homicidal ideations, intact judgment, average fund of knowledge, dysphoric affect, and her attention span was within normal limits. R. 328. She was to taper off Zoloft, begin a trial of Paxil, and continue Klonopin. *Id.*

Elizabeth continued to report symptoms of anxiety and depression throughout the relevant period. On November 20, 2014, she called Dr. Ford's office reporting an increase in depression and panic attacks, for which Dr. Ford prescribed bupropion. R. 1229. She did not discuss anxiety at her next visit with Dr. Ford on December 16 when she complained of dysuria and abdominal pain, *see* R. 1231–42, but Dr. Ford noted on January 6, 2015, that he was still monitoring her depression and would increase her bupropion, R. 1252. Elizabeth called Dr. Ford's office on January 12 regarding her depression medication, and Dr. Ford added citalopram. R. 1263. By April 22, her depression had improved, and she reported doing well on her

15

medications. R. 1296. Dr. Ford observed appropriate mood and affect on examination. R. 1300.

On July 28, Elizabeth followed up with Dr. Ford regarding her depression and reported that her

symptoms were "fairly controlled," but she still had some difficulty functioning. R. 1364. She

presented with "anxious/fearful thoughts, depressed mood, difficulty concentrating[,] and

diminished interest or pleasure[,] but denie[d] compulsive thoughts or fatigue." *Id.* Social

interactions also aggravated her depression. *Id.* Her mood and affect were appropriate on

examination. R. 1367. Dr. Ford noted that although bupropion had resulted in some

improvement, "more improvement to [t]his would be helpful," and he increased her dosage. R.

1363–64. On August 17, Elizabeth called Dr. Ford's office and relayed that she had been having

nightmares and shaking all the time since her bupropion was increased two weeks prior, so he

decreased her dosage. R. 1399.

B.      *The ALJ's Decision*

        In assessing Elizabeth's RFC, ALJ Kennedy summarized Elizabeth's subjective

statements regarding her symptoms[11] and determined that they were "not entirely consistent with

the medical evidence and other evidence in the record." R. 1430. He also explained that

Elizabeth's symptoms were not supported by the "treatment notes and examination findings" in

the record, which showed relatively conservative and effective treatment and "failed to

consistently reveal results that would be expected" considering Elizabeth's "allegations of

debilitating physical symptoms" and "significant functional limitations." R. 1432. He added that

the record "contains no opinions from treating or examining physicians stating that the claimant

was unable to work during the period at issue." *Id.*

---

[11] "Symptoms" are the claimant's own description of her medical condition. 20 C.F.R. §§ 404.1502(i),
416.902(i).

16

ALJ Kennedy also summarized Elizabeth's medical treatment history for the period at issue, R. 1431–32, and summarized her daily activities, R. 1433. He noted that Elizabeth reported she prepared simple meals; performed household chores, including "doing the laundry every day"; managed her finances, medications, and personal hygiene independently; maintained good relations with friends and family; drove unaccompanied; was able to function appropriately in places such as stores, church, and doctor's offices; got along with authority figures; and could follow instructions without difficulty. R. 1433. He concluded that Elizabeth's "ability to perform these activities [was] reflective of an individual at least able to perform a residual functional capacity as detailed above. Based on this record, the [ALJ] determined that the claimant's impairments would not prevent her from doing work within the residual functional capacity statement provided above." *Id.*

Finally, ALJ Kennedy considered the medical opinions of record. *See* R. 1433–34. First, he gave "little weight" to the state agency medical consultants' opinions. R. 1433. He explained that they "found that the claimant did not have any severe physical impairments or restrictions" and that their determinations were "inconsistent with the medical evidence of record, including treatment notes showing complaints to medical providers of pain and symptoms related to her conditions." *Id.* Second, he gave "little weight" to Dr. Iudica's treatment note indicating that Elizabeth "should avoid aggravating tasks" and should not lift "greater than 10 pounds until symptom free." *Id.* He explained that Dr. Iudica's opinion had "little probative value" because it was not clear that she intended the limitations she provided "to be permanent restrictions." *Id.* Third, he gave "[n]o weight" to an undated physician's assistant's opinion on a disabled parking placard application regarding Elizabeth's ability to walk. *Id.* at 1433–34. He stated that the opinion "fail[ed] to set forth the claimant's limitations," drew "a conclusion reserved to the

Commissioner," and was made by a physician's assistant, who "is not an acceptable medical
source." R. 1434. Finally, ALJ Kennedy explained that he gave "no weight" to "any opinions
regarding the claimant's limitations after the date last insured," as they did not concern the
relevant period. *Id.* Overall, he concluded that "the objective medical evidence, the opinions
already discussed above, and the claimant's actual range of daily activities demonstrate[d]" that
Elizabeth retained the RFC "to perform a range of medium work, as described above[,] prior to
March 23, 2016." *Id.*

C.    *Analysis*

        Elizabeth challenges the ALJ's RFC determination. *See generally* Pl.'s Br. 20–22. She
argues that ALJ Kennedy "rejected *all* medical source opinions of record, did not obtain
information regarding the RFC determined in [her] subsequent application that resulted in the
finding[] of disability, and issued an RFC finding based on [his] lay assessment of raw medical
evidence." *Id.* at 20. She also argues that ALJ Kennedy did not explain how the medical
evidence supported his conclusion that she could perform "medium" work, "as opposed to
supporting [her] alleged limitations" that she was disabled before March 23, 2016. *Id.* at 21; *see,
e.g.*, R. 1493 ("[ALJ Kennedy:] The claimant would grid out at light, so I am not going to give a
light residual functional capacity."). Her arguments are persuasive.

        A claimant's RFC is her "maximum remaining ability to do sustained work activities in
an ordinary work setting" for eight hours a day, five days a week despite her medical
impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)
(emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence
in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it
should reflect specific, credibly established "functional limitations or restrictions caused by

medical impairments and their related symptoms," including pain, that affect the claimant's

"capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at

*1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428,

2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va.

Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to determine whether an

alleged symptom or functional limitation is supported by or consistent with other relevant

evidence, including objective evidence of the underlying medical impairment, in the claimant's

record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at

*5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that he

considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of

Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and he built an "accurate and logical

bridge from that evidence to his conclusion" that the claimant is not disabled, *Woods v. Berryhill*,

888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and other brackets omitted). *See Thomas v.

Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656,

662 (4th Cir. 2017).

Here, ALJ Kennedy did not "build an accurate and logical bridge," *Woods*, 888 F.3d at

694, from the evidence to his conclusion that Elizabeth could perform "medium" work with

additional restrictions. He "concluded that [Elizabeth] could perform 'medium work' and

summarized evidence that he found credible, useful, and consistent," *Woods*, 888 F.3d at 694.

*See* R. 1431–33. "But the ALJ never explained how he concluded—*based on this evidence*—that

[Elizabeth] could actually perform the tasks required by 'medium work,' such as lifting up to 50

pounds at a time, frequently lifting or carrying 25 pounds, or standing or walking for six hours"

during an eight-hour workday. *Woods*, 888 F.3d at 694 (citing SSR 83-10, 1983 WL 31251, at

\*6). Fourth Circuit "precedent makes clear that meaningful review" of the RFC assessment "is

frustrated when the ALJ goes straight from listing evidence to stating a conclusion." *Thomas*,

916 F.3d at 311 (citing *Woods*, 888 F.3d at 694). Thus, "because [I] cannot gauge the propriety

of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the ALJ's denial

of benefits" for the relevant period. *Patterson*, 846 F.3d at 662.

The ALJ's reliance on Elizabeth's daily activities to support his RFC determination, *see*

R. 1433 (summarizing her reported daily activities and finding that her "ability to perform these

activities is reflective of an individual at least able to perform" the RFC he gave), is misplaced.

"An ALJ may not consider the *type* of activities a claimant can perform without also considering

the *extent* to which she can perform them." *Woods*, 888 F.3d at 694; *see also* SSR 96-8p, 1996

WL 374184, at \*1. "Being able to live independently and participate in the everyday activities of

life empowers people with disabilities and promotes their equal dignity. In pursuing those ends,

disability claimants should not have to risk a denial of Social Security benefits." *Arakas v.*

*Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 101 (4th Cir. 2020). Elizabeth reported that she could

prepare simple meals (sandwiches); perform some chores around the house; manage her

finances, medications, and personal hygiene independently; get along with friends and family;

drive independently; get along with authority figures; and follow instructions without difficulty.

*See* R. 237–45. None of these tasks support the conclusion that Elizabeth could do "medium"

work, including standing, sitting, and walking for six hours in an eight-hour day, lifting and

carrying twenty-five pounds "frequently," and lifting and carrying fifty pounds "occasionally,"

as those terms are defined in the DOT. *See* Dep't of Labor, Office of Admin. Law Judges,

Dictionary of Occupational Titles app. C ¶ IV(c) (4th ed. 1991) (defining "frequently" to mean

that the activity or condition exists from one-third to two-thirds of the time and "occasionally" to mean that the activity or condition exists up to one-third of the time); *accord* SSR 83-10, 1983 WL 31251, at \*5–6. Indeed, none of them suggest that Elizabeth is even capable of lifting fifty pounds *at all*, let alone "occasionally," or up to a third of her workday.

Some of ALJ Kennedy's characterizations of Elizabeth's daily activities are also inaccurate. ALJ Kennedy stated that Elizabeth could "perform household chores including cleaning the house, and doing the laundry every day." R. 1433. In fact, Elizabeth reported that she cleaned her house "twice weekly" for an hour and that she tried to "do a little bit everyday." R. 239. And when cleaning, she "ha[d] to sit down for a while" to take a break before "cleaning again." *Id.* She reported that she could do laundry, but she did not specify how often. *Id.* ALJ Kennedy also stated that Elizabeth "attended church" and "was able to function in an appropriate manner" while there. R. 1433. In fact, Elizabeth reported that she tried to attend church once a week, but that her back hurt "while sitting" and her feet hurt "when standing." R. 241. She had to "leave church early," and she was unable to "stay for dinners at church." R. 242. ALJ Kennedy also failed to mention that Elizabeth reported that she could not "walk a long distance," "ride a long distance," or "stand for long periods"; had trouble cooking "because of [her] back"; and could not do yard work because of her "back and knees." *Compare* R. 1433, *with* R. 238–40. He also failed to mention that Elizabeth claimed she could lift only five pounds and could walk only twenty feet before needing a ten minute break. *Compare* R. 1433, *with* R. 242. ALJ Kennedy thus selectively summarized facts that supported Elizabeth's independence, while leaving out those that suggested otherwise. This was improper. *Cf. Lewis*, 858 F.3d at 898 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.").

21

ALJ Kennedy did not rely on any of the medical opinions, which he afforded "little" to "no" weight, in finding that Elizabeth could perform "medium" work.[12] His reason for rejecting Dr. Iudica's March 2013 medical opinion that Elizabeth should "avoid" tasks that aggravated her lower back pain and should not lift "greater than 10 pounds until symptom free," R. 366, is logically flawed when viewed in context. ALJ Kennedy found this opinion had "little probative value because there [were] no indications that these limitations were intended to be permanent restrictions." R. 1433. Nonetheless, Dr. Iudica did indicate that she intended Elizabeth to comply with these physical restrictions until "symptom free." R. 366. Elizabeth's back pain did not resolve before March 23, 2016. *See, e.g.*, R. 800–05 (Apr. 2014); R. 811–12, 918–44 (May 2014); R. 990–91 (Oct. 2014); R. 1347–52 (July 2015); R. 2237–40 (May 2016). ALJ Kennedy also did not rely on Elizabeth's symptoms. *See* R. 1432. He rejected her reports that she was unable to work because of the limitations caused by her impairments, in particular that she could only sit for twenty minutes at a time, stand for ten minutes at a time, and lift ten pounds, R. 1430, finding them inconsistent with the record, R. 1432. Considering these deficiencies, I cannot find that ALJ Kennedy's decision is supported by substantial evidence.[13] *Wayne B. v. Saul*, No.

---

[12] "Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to every medical opinion in the record, taking into account factors such as the nature and extent of the source's treatment relationship with the claimant; how well the source explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the source's area of specialty. *Id.* §§ 404.1527(c), 416.927(c). A reviewing court "must defer to the ALJ's assignments of weight" among differing medical opinions unless his underlying findings or rationale "are not supported by substantial evidence" in the record, *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015), or they were reached by means of an improper standard or misapplication of the law, *see Coffman*, 829 F.2d at 517.

[13] Another flaw in ALJ Kennedy's decision is his failure to consider the effects of Elizabeth's allergies upon her ability to work. Elizabeth alleges multiple severe allergies. *See* R. 244 (listing allergies to wheat, corn syrup, eggs, peaches, seafood, milk, corn, oatmeal, corn starch, bananas, augmentin, and iodine). Her medical records confirm that she has had severe, and sometimes anaphylactic, allergic reactions, for which she carries an EpiPen. *See, e.g.*, R. 287–88 (documenting multiple allergens, conducting skin

7:18cv70, 2019 WL 3229164, at *6 (W.D. Va. June 25, 2019) (remanding where ALJ rejected

all of the medical opinions of record and "provided no support for his conclusion that [the

claimant] was capable of medium work, aside from generally noting [his] 'relatively normal' and

'benign' physical examinations, and inaccurately representing [his] daily activities").

Finally, I am concerned that ALJ Kennedy's decision contains no discussion or apparent

consideration of the evidence or medical opinions relevant to the Commissioner's conclusion

that Elizabeth was disabled as of March 23, 2016. Those documents are not included in this

record. It is thus entirely unclear from ALJ Kennedy's decision why Elizabeth was found

"disabled" on March 23, 2016, but was capable of "medium" work with some additional

restrictions on March 22, 2016, and before. To be sure, the ALJ did review some of the medical

evidence, and he determined that Elizabeth's treatment was both conservative and effective at

controlling her symptoms, examination findings did not support the degree of her alleged

limitations, and no medical opinion found her unable to work during the relevant period. R.

---

testing, and prescribing loratadine and an EpiPen); R. 291 (documenting occasional "accidental
exposures" to wheat at the daycare where she worked "due to serving food to children"); R. 291–92
(documenting a severe reaction to peaches, which caused "symptoms within seconds" and prompted
Elizabeth to use her EpiPen and call 911); R. 295–96 (documenting an allergic reaction to soybeans and a
suspected reaction to laundry detergent); R. 301–02 (documenting a severe reaction when Elizabeth
visited her friends' house where "they were using a dryer sheet in their dryer," which caused hives and
chest heaviness and prompted Elizabeth to use her EpiPen and call 911). In my prior Report &
Recommendation, I directed the Commissioner to consider the extent to which Elizabeth's allergies affect
her ability to work. *See* R. 1550. Nonetheless, ALJ Kennedy failed to do so in his decision. He mentioned
Elizabeth's allergies briefly, noting only that Elizabeth had alleged "severe allergies," R. 1430, and that
the medical evidence documented "severe food allergies," R. 1431 (citing R. 307–09, 328, 796, 864–65,
2198–201, 3055). Otherwise, he failed to determine whether the allergies were "medically determinable
impairments," and, if so, whether they were "severe" as that term is defined in the regulations and the
extent to which they caused any specific work-related functional limitations that should be included in the
RFC finding. *See, e.g.*, *Patricia G. v. Comm'r, Soc. Sec.*, Civ. No. 17-3654, 2018 WL 5841442, at *1–2
(D. Md. Nov. 8, 2018), *adopted by* 2018 WL 6704759 (D. Md. Nov. 27, 2018). ALJ Kennedy also failed
to address the fact that the VE testified that Elizabeth's "severe allergies" could both preclude her from
being able to perform her prior relevant work as a daycare worker and prevent her from being able to
perform other jobs existing in the national economy. *See* R. 1494–95. Accordingly, on remand, the ALJ
must properly consider all of Elizabeth's alleged medical impairments, including her allergies, and the
effects of those impairments on her ability to work.

1432. Even if the ALJ's cursory explanation could find support in the record, he simply did not reconcile his finding that Elizabeth could perform medium work on March 22, 2016, with the agency's determination that she was disabled the following day.

ALJ Kennedy appears to have concluded that Elizabeth could do "medium" work largely because, given her advanced age in November 2012, she may have been considered disabled under the Medical-Vocational Guidelines ("the Grids")[14] if ALJ Kennedy found that she was limited to less demanding "light" work after that date. *See* 20 C.F.R. pt. 404, subpt. P, app. 2. ALJ Kennedy suggested as much at Elizabeth's hearing, stating, while questioning the VE: "The claimant would grid out at light, so I am not going to give a light residual functional capacity." R. 1493. Given this statement and the lack of support in his decision for the RFC assessment, it is apparent that ALJ Kennedy did not meaningfully evaluate Elizabeth's impairment-related "functional limitations or restrictions and assess [her] work-related abilities on a function-by-function basis," as the regulations require. SSR 96-8p, 1996 WL 374184, at *1; *see also Allen v. Colvin*, No. CIV-15-200-SPS, 2016 WL 5408139, at *3 (E.D. Okla. Sept. 28, 2016) ("The ALJ has thus failed to point to medical evidence demonstrating [that] the claimant can perform medium work. Rather, it seems the ALJ took great pains to only cite to evidence that the claimant could perform medium work, in an effort to avoid finding him disabled, which would be required here upon an RFC determination of either light or sedentary work.").

*

As noted, Elizabeth asks the Court to reverse ALJ Kennedy's decision and remand with

---

[14] The Grids are published tables and administrative rules that can be used in certain cases to "direct[] a conclusion [at step five] as to whether the individual is or is not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a); *see also Aistrop v. Barnhart*, 36 F. App'x 145, 146 (4th Cir. 2002). In such cases, they help streamline the disability determination by providing competent evidence that a significant number of jobs exist (or do not exist) in the national economy that the claimant can perform considering his or her exertional RFC, age, education, and work history. *See id.* § 200(a), (d).

instructions for the Commissioner to award disability benefits effective November 1, 2012. *See* Pl.'s Br. 24–25. Where, as here, the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). There are exceptions, of course, such as cases where the claimant's otherwise fully developed "record does not contain substantial evidence to support a decision denying [benefits] under the correct legal standard," *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974), "the delay involved in repeated [federal-court] remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court," *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at \*17 (W.D. Va. June 24, 2014) (quoting *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 800 (E.D. Wis. 2004)). *See Radford*, 734 F.3d at 295 (citing *Breeden*, 493 F.3d at 1011–12). The district court has discretion to choose the appropriate remedy. *See id.*; *McKinney v. Colvin*, 111 F. Supp. 3d 663, 666 (E.D.N.C. 2015). Elizabeth's claims have been pending for many years and were remanded once before under the fourth sentence of 42 U.S.C. § 405(g). Given ALJ Kennedy's failure to logically explain his RFC determination, however, I find that these factors alone do not justify remanding for an award of benefits. *See, e.g.*, *Felicia T. v. Saul*, No. 4:20cv33, 2021 WL 2910206, at \*6 (W.D. Va. July 12, 2021) (declining to award benefits on a post-remand appeal where ALJ failed to explain material conflicts in RFC assessment, even though claim had been pending for almost nine years); *Ellis*, 2014 WL 2862703, at \*17 (declining to award benefits on a post-remand appeal where ALJ failed to explain material conflicts in the RFC assessment, even though claim had been pending for almost eight years and facts presented "a close case, particularly given the small amount of benefits involved").

25

I take no position on whether Elizabeth is entitled to disability benefits for the relevant period. But this Court must not "reflexively rubber-stamp [the] ALJ's findings." *Lewis*, 858 F.3d at 869. ALJ Kennedy did not "build an accurate and logical bridge," *Woods*, 888 F.3d at 694, from the evidence to his conclusion that Elizabeth could perform "medium" work with additional restrictions. Accordingly, I cannot find that his decision is supported by substantial evidence. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record (including the evidence pertaining to Elizabeth's allegedly severe allergies); explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Elizabeth cannot prove she is disabled based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination. The ALJ also should consider the effect of the Commissioner's intervening disability determination in assessing whether Elizabeth was also legally disabled at any point from November 1, 2012, through March 22, 2016.

### IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Elizabeth's Motion for Summary Judgment, ECF No. 20, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 26, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 25, 2021

Joel C. Hoppe
United States Magistrate Judge

27